UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 18-11513-RGS

WARREN ENVIRONMENTAL, INC.

v.

SOURCE ONE ENVIRONMENTAL, LTD., et al.

MEMORANDUM AND ORDER ON
DEFENDANTS' RULE 12(b)(2) AND 12(b)(6) MOTION TO DISMISS

April 24, 2020

STEARNS, D.J.

By way of a First Amended Complaint (FAC), Warren Environmental, Inc. (WEI), sues three corporate defendants for claims arising from the defendants' alleged "contractual failure to maintain Warren Environmental's patent in Europe for a proprietary epoxy pumping system." FAC (Dkt # 4) ¶ 1. Defendants include: Fernco, Inc. (Fernco), a Michigan-based corporation; Flex-Seal Couplings, Ltd. (Flex-Seal), a wholly owned subsidiary of Fernco, based in England; and Source One Environmental, Ltd., successor in interest to Fernco Environmental, Ltd. (Source One), a wholly owned subsidiary of Flex-Seal, also based in England.

WEI's FAC sets out five claims against defendants in varying combinations: breach of contract (Count 1) against Source One and Flex-

Seal; breach of the duty of good faith and fair dealing (Count 2) against Source One and Flex-Seal; negligence (Count 3) against Source One and Flex-Seal; violations of Mass. Gen. Laws ch. 93A (Count 4) against all defendants; and interference with contractual relations (Count 5) against Fernco. WEI also seeks an accounting of sales and profits resulting from the defendants' sales of non-WEI epoxy spray systems and epoxy resins, and injunctive relief and damages.

Defendants move to dismiss Counts 4 and 5 as against Fernco for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2). Defendants also move under Rule 12(b)(6) to dismiss the following claims for failure to state a claim upon which relief can be granted: Counts 1 and 2 as to Flex-Seal only; Count 3 against Source One and Flex-Seal; Count 4 as to all defendants; and Count 5 against Fernco.

For the reasons to be explained, defendants' Fed. R. Civ. P. 12(b)(2) motion will be allowed, resulting in dismissal of Count 4 as to Fernco and Count 5. The Rule 12(b)(6) motion will be allowed as to Counts 1, 2, and 3 against Flex-Seal only, and Count 4 against both Flex-Seal and Source One. Counts 1, 2, and 3 may move forward as to Source One.

## BACKGROUND

The essential facts, drawn from the FAC and documents incorporated by reference, and viewed in the light most favorable to WEI as the nonmoving party, are as follows.  WEI, headquartered in Massachusetts, owns a U.S. patent for a spray epoxy application system known as the Warren Environmental System (WES).  The WES "revolutionized how epoxy could be applied to infrastructure repair jobs," in part because the WES permitted spray application of a heated epoxy, which "decreased labor costs and increased the amount of daily square foot coverage."  FAC ¶ 16.  WEI also developed epoxies that "outperform competitors on industry tests," *id.* ¶ 19, and apparently are recognized as among the best on the global market.

In 2006, WEI filed an international patent application for its epoxy products and spray system.  Beginning in 2007 and continuing into early 2008, Source One approached WEI about overseas use of WEI's products.  In 2008, Source One – allegedly operating "under the orders of the parent company Fernco, Inc. of Michigan," *id.* ¶ 29 – entered into a licensing agreement with WEI.[1]  The agreement granted Source One "directly or through its agent Flex-Seal Couplings, LTD, . . . [the exclusive right] to use

---

[1] The references in the signed Agreements to "Fernco" refer to "Fernco Environmental, Ltd." – the entity now known as Source One – not Fernco, Inc., the parent company and separate defendant in this litigation.  Fernco Environmental, Ltd. became Source One in January of 2014.  *See* FAC ¶ 37.

and sub-license WEI's patented pumping system and its epoxy products in an '[A]greed [T]erritory' which included Europe, Australia, New Zealand and Norway."  *Id.* ¶ 30; Dkt # 31-1 ¶ 16.1.  WES was to be sold under the name "Ultracoat."   Among other obligations, Source One agreed to be held "responsible for the maintenance and policing of the Warren patent within its territories."  Dkt # 31-1 ¶ 14.3.

In July of 2008, on the same date that WEI and Source One signed the licensing agreement, WEI and Flex-Seal executed a Deed of Assignment in which WEI assigned to Flex-Seal its patent rights in the "Agreed Territories." *See id.* at 16-17.   Flex-Seal, as the assignee of the patent rights, was designated to act in an agency capacity for its subsidiary Source One in arranging for the protection of the patent rights.  FAC ¶ 34.  In that role, Flex-Seal hired the English law firm Wilson Gunn to prosecute the patent before the European Patent Office (EPO) and designated its Commercial Director, Steve Riding, as the liaison with Wilson Gunn.

Through February of 2015, Wilson Gunn periodically reported on the status of WEI's patent application to Andrew Williams, who served as the Finance Director for both Flex-Seal and Source-One.  Williams regularly

shared progress reports with Glenn Cartledge, who was appointed Managing Director of Source One in February of 2015.[2]

In November of 2014, Wilson Gunn notified Riding that it had received a notice (Rule 71(3) EPC) from the EPO requiring Flex-Seal to file a "fee for grant and publish[] and file a translation of the claims in the two official languages of the [EPO] other than the language of the proceedings" by March 10, 2015.  FAC ¶¶ 48-49.  In a February 2015 meeting with Wilson Gunn, Riding learned that WEI's assignment of rights to Flex-Seal had never been recorded.  Immediate steps were then taken to record the assignment, but Wilson Gunn was given no instructions regarding the Rule 71(3) filing date.  Wilson Gunn reminded Riding three more times after the meeting about the upcoming filing deadline.

On March 6, 2015, in response to a request from Riding for further information, Wilson Gunn advised of a "further processing procedure" permitting a two-month extension of the filing deadline.  *Id.* ¶ 52.  Riding "instructed Wilson Gunn to monitor the further processing deadline and issue reminders to him."  *Id.* ¶ 53.  Wilson Gunn determined that the

---

[2] Prior to February of 2015, Tony Leland served as Managing Director of both Flex-Seal and Source One.  FAC ¶¶ 37-38.  Leland's signature appears both on WEI's Agreement with Source One and on the Deed of Assignment with Flex-Seal.

extended deadline was June 26, 2015, after receiving a loss of rights notification dated April 16, 2015.  Flex-Seal did not inform WEI of the filing fiasco.  Over the next two months, Wilson Gunn periodically notified Riding of the looming June 26, 2015 deadline.  Riding forwarded each of the Wilson Gunn reminders to Williams and Cartledge, who "informed Mr. Riding that he need not take any action without further instructions." *Id.* ¶ 56.  Cartledge and Williams, however, never provided further instructions to Riding, and when the June 26 deadline passed, WEI's patent lapsed.

In November of 2015, Wilson Gunn sought to re-instate the patent with the EPO, describing the sorry story of the miscommunications that had led to its lapse.  The EPO provisionally declined to reinstate the patent in May of 2016, but called for the submission of supplemental filings.  Included among the submitted supplemental filings was a confessional affidavit from Cartledge, admitting that he had "failed to provide [Riding] with instructions to respond to the R71(3) communication."  Dkt # 4-3 ¶ 19.

According to the EPO, "[i]n accordance with Article 122(1) EPC, an applicant has his rights re-established upon request if he was unable to observe a time limit vis-à-vis the EPO in spite of all due care required by the circumstances having been taken."  Dkt # 4-4 ¶ II.4.  On March 5, 2018, the EPO rejected the request to re-establish the patent, after concluding that

Flex-Seal had "not taken all the due care required by the circumstances." *Id.* ¶ II.21. At the same time, the EPO concluded that WEI had "fulfilled the prerequisite of all due care," *id.* ¶ II.10, as had Wilson Gunn. *Id.* ¶ II.23.

As a result of the patent's lapse, WEI's technology is no longer "protected technology in the European Union." FAC ¶ 69. Accordingly, WEI asserts that "WEI's ability to market, license, and sell its proprietary systems and products in the EU has substantially diminished." *Id.* ¶ 70. WEI also alleges that WEI's technology may now "be duplicated and used in the EU without fear of patent infringement . . . [thus] significantly decreas[ing] WEI's competitive advantage in the EU." *Id.* ¶ 71. On September 27, 2016, Source One and Flex-Seal executed an Assignment of Rights and Interests, transferring all rights in the patent back to WEI.

WEI alleges other contractual breaches apart from those involving the loss of its European patent. In particular, WEI alleges that under the direction of Chris Cooper, Chief Executive Officer (CEO) of Fernco, and allegedly in violation of contractual obligations, "the defendants had secretly designed, engineered and created drawings for a spray system to compete with WEI's system [and] filed for a patent application in Australia for their system." *Id.* ¶ 116. WEI further alleges that under Cooper's supervision, defendants "attempted to design and test a knock-off epoxy" and "solicited,

7

bought, sold and/or manufactured a copycat epoxy product." *Id.* ¶ 118. WEI asserts that Cooper directed Source One in particular "to have WEI epoxies reverse[] engineered and/or manufactured by a German company who then produced copycat epoxy resins for the defendants." *Id.* ¶ 119. WEI contends that "defendants secretly sold knock-off, non-WEI epoxies to its European licensees under the Ultracoat name for use with WEI's licensed spray system," *id.* ¶ 120, and that they "also manufactured, built, sold and/or used competing spray systems other than the WEI's systems." *Id.* ¶ 121.

WEI filed its FAC before the court in August of 2018, after which time the parties unsuccessfully attempted to mediate their various disputes. In October of 2019, this court authorized limited jurisdictional discovery, after determining that "WEI ha[d] made a colorable claim for specific jurisdiction at this early motion to dismiss stage." Dkt # 39. WEI and the defendants then filed supplemental memoranda with attached exhibits for the court's review.

## DISCUSSION

### I.    Personal Jurisdiction over Fernco

As a rule, a court should determine whether Article III jurisdiction exists before considering the merits of a plaintiff's claim. *Steel Co. v. Citizens for a Better Env't.*, 523 U.S. 83, 88-89 (1998). "*In personam* jurisdiction 'is

of two varieties, general and specific.  General personal jurisdiction . . . is the power of a forum-based court . . . which may be asserted in connection with suits not directly founded on [that defendant's] forum-based conduct . . . .'" *In re Lupron Mktg. & Sales Practices Litig.*, 245 F. Supp. 2d 280, 288 (D. Mass. 2003) (alteration in original), quoting *Donatelli v. Nat'l Hockey League,* 893 F.2d 459, 462-463 (1st Cir. 1990).   "Under the Fifth Amendment, a court may exercise general or specific jurisdiction over an out-of-state defendant only if that defendant has 'certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."'" *Copia Commc'ns, LLC v. AMResorts, L.P.*, 812 F.3d 1, 4 (1st Cir. 2016), quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945).

"Specific personal jurisdiction, by contrast, is narrower in scope and may only be relied upon 'where the cause of action arises directly out of, or relates to, the defendant's forum-based contacts.'" *Pritzker v. Yari*, 42 F.3d 53, 60 (1st Cir. 1994), quoting *United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1088-1089 (1st Cir. 1992).  The three elements of specific jurisdiction are relatedness (the nexus of plaintiff's claim with the defendant's contact with the forum), purposeful availment (something more than an isolated contact or the unilateral activity of a third

person), and the reasonableness of the exercise of jurisdiction (the five Gestalt factors). *Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc.*, 825 F.3d 28, 35 (1st Cir. 2016).

"In determining whether a non-resident defendant is subject to its jurisdiction, a federal court exercising diversity jurisdiction 'is the functional equivalent of a state court sitting in the forum state.'" *Sawtelle v. Farrell*, 70 F.3d 1381, 1387 (1st Cir. 1995), quoting *Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 204 (1st Cir. 1994). "The plaintiff has the burden of establishing that jurisdiction over the defendant lies in the forum state." *Baskin-Robbins*, 825 F.3d at 34. "For the purpose of examining the merits of such a jurisdictional proffer, . . . [a] district court [may] take the facts from the pleadings and whatever supplemental filings (such as affidavits) are contained in the record, giving credence to the plaintiff's version of genuinely contested facts . . . [while also] tak[ing] into account undisputed facts put forth by the defendant." *Id.* (internal citation omitted).

The court seeks to determine "whether the plaintiff has proffered evidence that, if credited, is enough to support findings of all facts essential to personal jurisdiction." *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 51 (1st Cir. 2002), quoting *Foster-Miller, Inc. v. Babcock & Wilcox Canada*, 46 F.3d 138, 145 (1st Cir. 1995). This entails

satisfying "the requirements of both the Due Process Clause of the federal Constitution and the Massachusetts long-arm statute, Mass. Gen. Laws ch. 223A, § 3." *Baskin-Robbins*, 825 F.3d at 34.

With respect to Fernco, WEI alleges tortious interference with contractual relations (Count 5) and a violation of the Massachusetts Unfair Business Practices Statute, Chapter 93A (Count 4). WEI does not argue that Fernco's virtually non-existent independent contacts with Massachusetts give this court a basis for personal jurisdiction over it.[3] Rather, WEI argues

─────────────

[3] As this court noted previously, "Fernco contends, and WEI implicitly agrees, that Fernco does not have sufficient 'continuous and systematic' contacts with Massachusetts to be subject to general jurisdiction in this forum." Dkt # 39. The Supreme Court has explained that "[a] court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (alteration in original), quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). The inquiry "is not whether a foreign corporation's in-forum contacts can be said to be in some sense 'continuous and systematic,' it is whether that corporation's 'affiliations with the State are so "continuous and systematic" as to render [it] essentially at home in the forum State.'" *Id.* at 138-139, quoting *Goodyear*, 564 U.S. at 919. "In the absence of general jurisdiction, a court's power depends upon the existence of specific jurisdiction." *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 51 (1st Cir. 2002), quoting *Massachusetts Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 34 (1st Cir. 1998).

Nor does WEI's allegation that Fernco sells certain products in Massachusetts through Home Depot outlets, *see* FAC ¶ 9, suffice to serve as a basis for personal jurisdiction because WEI is unable to show that it

that "[t]he control by Fernco over Source One, and [the fact] that Fernco sought to benefit from [this] control and decision making position, created a principal-agent relationship with Source One [subjecting] Fernco [to] jurisdiction here." Dkt # 31 at 3.[4]  WEI alleges that "Fernco directed its subsidiaries to solicit and execute a licensing agreement with WEI in Massachusetts, authorized its subsidiaries to meet and train with WEI at its Massachusetts facility and oversaw, controlled and/or directed its England subsidiaries when dealing with WEI," FAC ¶ 10 – and that in approaching WEI, Source One acted "under the orders of the parent company Fernco, Inc." *Id.* ¶ 29.

---

suffered any injury arising from these sales. *See  Stanton v. AM Gen. Corp.*, 50 Mass. App. Ct. 116, 118 (2000) ("Even were we to determine that because [a defendant's products] were sold . . . in Boston, [the defendant] is doing business in Massachusetts, the plaintiff has not shown that his injury grew out of that business."). WEI also alleges that "[b]efore entering into the license with WEI, Fernco required Danny Warren of WEI to meet with the Cooper family, the owners of Fernco, in Michigan before any deal would be approved." FAC ¶ 10. This allegation does little to support WEI's cause. *See United Elec., Radio & Mach. Workers*, 960 F.2d at 1090 ("If the negotiations occurred outside the forum state, their existence cannot serve to bolster the argument for the assertion of jurisdiction in the forum.").

[4] WEI further avers that "because Fernco was fully aware of the agreement between Source One and WEI, Fernco knew that Source One would be subject to personal jurisdiction in this forum." Dkt # 31 at 3. The import of this allegation, as true as it may be, is unclear when it comes to the issue of Fernco's presence in the forum.

The issue is whether WEI, with the benefit of the jurisdictional discovery authorized by the court, is able to establish that Fernco's control over Source One or Flex Seal was so pervasive as to overcome the strong Massachusetts presumption against the piercing of the corporate form, or more colloquially, the corporate veil. *See United Elec., Radio & Mach. Workers,* 960 F.2d at 1091 ("[I]f the record contains facts that warrant disregarding [a wholly owned subsidiary's] corporate independence, the district court [is] entitled to find [the parent company] subject to personal jurisdiction in Massachusetts on the basis of its relationship with its subsidiary.").[5]

---

[5] Defendants do not move to dismiss the claims against Source One and Flex-Seal pursuant to Rule 12(b)(2). They do assert in a responsive pleading that "Source One did not consent to personal jurisdiction in Massachusetts." Dkt # 38 at 5. In this regard, defendants highlight the fact that the forum selection clause in Source One's Agreement with WEI makes no reference to Massachusetts. *See CRG Fin., LLC v. Two Diamond Capital Corp.*, 2020 WL 1308193, at *5 (D. Mass. Mar. 19, 2020) (quotations and citations omitted, alteration in original) ("Although the mere fact that a company in Massachusetts executes a contract with an entity in another state does not automatically mean that the foreign [entity] transacted business within the meaning of the statute, meaningful contact with a Massachusetts company and the forum will confer jurisdiction."). However, the Agreement does contain a dispute resolution clause committing disputes between Source One and WEI to resolution "before a Massachusetts mediator mutually selected by the parties." Dkt # 31-1 ¶ II.19.1. The defendants state nonetheless that they intend to preserve the argument that "the courts of the United Kingdom are most relevant to this dispute." Dkt # 38 at 5 n.4.

WEI faces a stiff climb. "Only in rare instances, in order to prevent gross inequity, will a Massachusetts court look beyond the corporate form." *Spaneas v. Travelers Indem. Co.*, 423 Mass. 352, 354 (1996). "[T]he concept that 'a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries,' is 'deeply "ingrained in our economic and legal systems."'" *Scott v. NG U.S. 1, Inc.*, 450 Mass. 760, 766 (2008), quoting *United States v. Bestfoods*, 524 U.S. 51, 61 (1998); *see also United Elec., Radio & Mach. Workers,* 960 F.2d at 1091, quoting *Sher v. Johnson,* 911 F.2d 1357, 1365 (9th Cir. 1990) ("[W]hile it is generally true that questions of '[l]iability and jurisdiction are independent,' the factors that we must consider for purposes of piercing the veil separating two corporations in the liability context also inform the jurisdictional inquiry."); *Scott*, 450 Mass. at 767 ("In Massachusetts, the equitable doctrine of corporate disregard differs in no material respect from the description in *United States v. Bestfoods,* 524 U.S. at 62-63.").

The usual Massachusetts veil-piercing test requires more than a parental exercise of "some form of pervasive control" over the subsidiary. *Scott*, 450 Mass. at 767. There must also be a showing of "some fraudulent or injurious consequence of the intercorporate relationship." *Id.* "Corporate formalities also may be disregarded 'when there is a confused intermingling

of activity of two or more corporations engaged in a common enterprise *with substantial disregard of the separate nature of the corporate entities,* or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting.'" *Id.* (emphasis in original), quoting *My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 619 (1968).  Under either branch, the presumption of corporate separateness can only be overcome by clear evidence.  *See Escude Cruz v. Ortho Pharm. Corp.*, 619 F.2d 902, 905 (1st Cir. 1980).

"In determining whether one entity exercised 'pervasive control' over another, and whether 'confused intermingling' exists sufficient to disregard the corporate formalities, [a court should] focus on the events giving rise to liability . . . ." *Scott*, 450 Mass. at 770.  A claim of "overall financial or policy control" by the parent is insufficient.  *Andresen v. Diorio*, 349 F.3d 8, 12 (1st Cir. 2003).  Twelve factors in particular

> should be considered in deciding whether to penetrate the corporate form: (1) common ownership; (2) pervasive control; (3) confused intermingling of business activity assets, or management; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporate assets by the dominant shareholders; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; [and] (12) use of the corporation in promoting fraud.

*Evans v. Multicon Constr. Corp.*, 30 Mass. App. Ct. 728, 733 (1991), citing *Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc.*, 754 F.2d 10, 14-16 (1st Cir. 1985).   "Ultimately, the decision to disregard settled expectations accompanying corporate form requires a determination that the parent corporation directed and controlled the subsidiary, and used it for an improper purpose . . . ." *Scott*, 450 Mass. at 768.  "Customary incidents of a parent-subsidiary relationship – ownership, common personnel, profits, and managerial oversight" – are "insufficient in and of themselves to permit the assertion of vicarious jurisdiction." *In re Lupron*, 245 F. Supp. 2d at 292.

In its pursuit of the *Pepsi-Cola* factors, WEI has sufficient evidence to establish "common ownership"– Fernco owns all of the shares of Flex-Seal and Flex-Seal, in turn, owns all of the shares of Source One. *See* Dkt # 46-1. WEI has also shown intermingling of management – Cooper, the CEO of Fernco, also serves as a director of Source One, Dkt #46-1 at 1, and as an officer of Flex-Seal.  According to WEI, Cooper "made no [public] effort to differentiate" among the three leadership positions, noting that "Cooper's email correspondence identifies him as follows: 'Chris Cooper, CEO Fernco, Flex-Seal, S1E,'" Dkt # 46 at 2, quoting Dkt # 46-4, and at other times only as the CEO of Fernco.  From this constellation of titles, WEI argues that "[g]iven the sophistication of Fernco, it can be inferred that Fernco and

Cooper maintained this arrangement so that Fernco could keep the U.K. subsidiaries squarely under its control." Dkt # 46 at 3.  The inference is not as compelling, however, as WEI would have it, particularly when viewed through the lens of the obstacles faced when conducting transnational corporate business in often radically differing national legal environments. "[C]ourts generally presume 'that the directors are wearing their "subsidiary hats" and not their "parent hats" when acting for the subsidiary.'" *Bestfoods*, 524 U.S. at 69, quoting P. Blumberg, Law of Corporate Groups: Procedural Problems in the Law of Parent and Subsidiary Corporations § 1.02.1 at 12 (1983).  Accordingly, "it cannot be enough to establish liability here that dual officers and directors made policy decisions and supervised activities." *Id.* at 70.

WEI argues that Cooper provided more than general supervision to the companies in which he was engaged, asserting that he "had his hand in every major decision made at Source One and Flex-Seal." Dkt #46 at 3. WEI points to five discrete categories of direct involvement that seem fairly established by discovery: (1) that "Capital requests and yearly budgets were scrutinized in detail by Cooper and had to be approved by Fernco Michigan's board of directors," Dkt # 46 at 3; (2) that "Cooper mandated that all new products must be approved by him before going to market," Dkt # 46 at 4; (3) that

"Cooper also used his authority to redraft 'Position Results Descriptions,'" *id.*, as part of his managerial oversight; (4) that on at least one occasion Cooper insisted that the former Managing Director of Flex-Seal and Source One meet with him in Michigan to discuss the Managing Director's responsibilities and impending retirement; and (5) that Cooper engaged in "micromanagement" of "when [subsidiary] employees took vacations and how and when employees would receive Christmas bonuses." Dkt # 46 at 5. As suggestive as WEI would have the court find it, nothing about the role Cooper played as CEO of Fernco or, in a change of hats, as a director of various Fernco subsidiaries, is inconsistent with the functions and duties that a person in a key management position in a corporate conglomerate would be expected to perform – nor do his actions appear to relate to the events that WEI claims give rise to liability on Fernco's part. *See Scott*, 450 Mass. at 770.

WEI makes several allegations that appear to have more of a relationship to the contract at issue in this case.[6]  Specifically, WEI asserts

---

[6] Danny Warren, Director of WEI, also states in an affidavit that Cooper "had" him to fly to Michigan to meet with his father, Fernco's founder and owner, as well as tour Fernco's Michigan facilities, before Source One would enter a deal with WEI. *See* Dkt # 31-3 ¶ 8.  WEI argued, prior to jurisdictional discovery, that this meeting evinced Fernco's control over its subsidiaries, as "[o]nly after WEI was approved by Fernco, did it send [Source One] executive

that "[w]hen a misunderstanding arose about the performance of the contract [with Source One], Chris Cooper flew from Fernco's Michigan headquarters to meet with Danny Warren,"  Dkt # 46 at 5, and that Cooper employed a "good cop/bad cop" routine with Glenn Cartledge of Source One in negotiating with Warren, *id.* at 5-6, to whom Cooper referred using an insulting nickname.  *Id.* at 6.  Finally, WEI alleges that "it was Chris Cooper who personally met with and solicited Reddog, a Utah company, as a back-up supplier of epoxy resins" and that "it was Cooper who sought a Germany based epoxy supplier," Dkt # 46 at 5, in alleged violation of WEI's Agreement with Source One.  *See* FAC ¶¶ 90, 119; Dkt # 31-1 ¶¶ 11.2, 14.3, 15.1-15.5, 16.2 (outlining contractual obligations).

Taken together, and in light of the presumption that shared officers are assumed to be acting on behalf of the subsidiary rather than the parent company, WEI's facts, such as they are, do not come anywhere near close to demonstrating "action by a dual officer plainly contrary to the interests of the subsidiary yet nonetheless advantageous to the parent."[7]  *Bestfoods*, 524 U.S.

---

Tony Leland to Middleboro to negotiate and enter into a licensing agreement with WEI."  Dkt # 31 at 3.

[7] Defendants have submitted extensive evidence documenting an alleged scrupulous respect among Fernco and its subsidiaries for corporate formalities.  In light of the court's determination that WEI has not met its veil-piercing burden, there is no reason to delve further into this issue.

at 70 n.13.  On the contrary, these facts more closely resemble "normal badges of ownership such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, or the sharing of directors, officers and employees."  *In re Lupron*, 245 F. Supp. 2d at 291 (internal citation and quotations omitted).  Accordingly, the court declines WEI's invitation to pierce the corporate veil with respect to Fernco.[8]

## II.   Motion to Dismiss for failure to state a claim

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp.*

---

[8] As an aside, the court notes that were it to find the exercise of specific jurisdiction over Fernco proper through a theory of agency, this would render WEI's claim of interference with contractual relations under Count 5 legally impossible.  "To prevail on a claim of tortious interference with a contract, a plaintiff must establish that '(1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions.'"  *Weiler v. PortfolioScope, Inc.*, 469 Mass. 75, 84 (2014), quoting *Psy-Ed Corp. v. Klein,* 459 Mass. 697, 715-716 (2011).  If Source One and Flex-Seal were to be considered Fernco's agents, it would be impossible for WEI to establish that Fernco interfered with Source One's contract as a third party.  Separately, as explained below, WEI's Chapter 93A claim fails as a matter of law.  Fernco is not named in any additional counts.

*v. Twombly*, 550 U.S. 544, 570 (2007).   Two basic principles guide the court's analysis.   "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.   "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss."   *Id.* at 679.   A claim is facially plausible if its factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Id.* at 678.

### a. Count 1, breach of contract, and Count 2, breach of duty of good faith and fair dealing, as to Flex-Seal

WEI brings a breach of contract claim against Source One and Flex-Seal.[9]   "Under Massachusetts law, a breach of contract claim requires the

---

[9] Specifically, WEI alleges violation of:

numerous provisions of the parties' Agreement including a) prohibition against using confidential information in general; b) prohibition against using confidential information to develop a competing or similar product or service; c) joint ownership of all developments and inventions related to the parties' venture; d) prohibition against competing with WEI in the defined territory; e) express obligation that [Source One] inform WEI of competitor products encountered in the marketplace; f) obligation to ensure that WEI's spray system and its epoxy resins are marketed in the defined territory; g) prohibition on using any other epoxy resins with WEI's system; h) prohibition against making any changes to the equipment and equipment specifications; i) the obligation to maintain the patent in the EU.

FAC ¶ 84.  *See also* Dkt # 31-1 ¶¶ 11.2, 14.3, 15.1-15.5, 16.2 (outlining contractual obligations).

plaintiff to show that (1) a valid contract between the parties existed, (2) the plaintiff was ready, willing, and able to perform, (3) the defendant was in breach of the contract, and (4) the plaintiff sustained damages as a result." *Bose Corp. v. Ejaz*, 732 F.3d 17, 21 (1st Cir. 2013), citing *Singarella v. City of Boston*, 342 Mass. 385, 387 (1961).

Defendants move to dismiss Count 1 as to Flex-Seal only, arguing that WEI's alleged breaches relate wholly to obligations undertaken by Source One in its Agreement with WEI, to which Flex-Seal was not a party. WEI counters that while Flex-Seal was not a signatory to its Agreement with Source One, "the Agreement and the Deed of Assignment, which Flex-Seal admits that it is bound by, comprise constituent parts of a single transaction and should thus be read together." Dkt # 31 at 5. Defendants respond that even if that were the case, "the unambiguous contractual language dictates that only Source One agreed to obligations that [WEI] claims were breached." Dkt # 38 at 6. Defendants have the better argument.

Under Massachusetts law, factors relevant to assessing whether "instruments deriving from a given transaction shall be read together," include "simultaneity of execution, identity of subject matter and parties, cross-referencing, and interdependency of provisions." *Gilmore v. Century Bank & Tr. Co.*, 20 Mass. App. Ct. 49, 56 (1985). *See also Lass v. Bank of*

*Am., N.A.*, 695 F.3d 129, 135 (1st Cir. 2012) (pointing to *Gilmore* as affirming a "well established principle" of law).  Here, as WEI highlights, the Deed of Assignment was signed on the same date as WEI's Agreement with Source One; the same person, John A. Leland, signed the Agreement and Deed of Assignment on behalf of both Source One and Flex-Seal, respectively; the Deed of Assignment is referenced in the text of the Agreement, *see* Dkt # 31-1 at 1 ("Other than the rights granted in the Deed of Assignment, attached as Exhibit 2, to assign an equal and undivided share in the WEI's patents, as described therein . . . ."); and Flex-Seal is referenced in Exhibit 1 of the Agreement as Source One's agent.  *See* Dkt # 31-1 at 13 (authorizing Source One to engage in certain actions "either directly or through its agent Flex Seal Couplings, Ltd.," within a proscribed territory).  The documents are also interdependent in the sense that the Deed of Assignment facilitates Source One's ability to carry out its obligations under the Agreement.

It does not, however, follow that obligations expressly assumed by Source One become imputed to Flex-Seal, given Flex-Seal's express identification as Source One's agent.  *See* Dkt # 31-1 at 1, 13.  "[A]gents do not obtain rights or responsibilities from contracts entered into by their principals, absent additional contractual terms such as third-party beneficiary provisions or indemnification clauses."  *Constantino v.*

*Frechette*, 73 Mass. App. Ct. 352, 358 (2008).  Further, while an agent may bind a principal, without the latter's consent, the converse is not true. *Walker v. Collyer*, 85 Mass. App. Ct. 311, 323, 325 (2014).  Here, WEI alleges breach of provisions of the Agreement it signed with Source One, *see* FAC ¶ 84; WEI does not allege breach of any distinct obligations that Flex-Seal assumed in signing the Deed of Assignment.  No contractual provisions bound Flex-Seal to uphold the contractual obligations that Source One assumed in the Agreement it signed with WEI.  In sum, WEI has not alleged facts sufficient to state a breach of contract claim against Flex-Seal.

It follows that WEI's claim alleging breach of the duty of good faith and fair dealing also fails with respect to Flex-Seal.  It is true that "[e]very contract implies good faith and fair dealing between the parties to it." *Warner Ins. Co. v. Comm'r of Ins.*, 406 Mass. 354, 362 n.9 (1990), quoting *Kerrigan v. Boston*, 361 Mass. 24, 33 (1972).  However, the duty of good faith and fair dealing may not "be invoked to create rights and duties not otherwise provided for in the existing contractual relationship, as the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." *Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004).  As indicated above, the court does not consider Flex-Seal contractually bound

by the provisions of the Agreement which WEI alleges were breached. Counts 1 and 2 against Flex-Seal therefore will be dismissed.

### b. Count 3, negligence, as to Flex-Seal and Source One

Next, WEI alleges that "defendants breached the duty of care they owed to [WEI] when their employees, agents and/or servants, particularly Mr. Riding, Mr. Cartledge and Mr. Williams failed to provide the required instructions to Wilson Gunn to meet the filing deadlines established by the EPO." FAC ¶ 112. Defendants argue that WEI's negligence claims should be dismissed because they "are premised solely on purported contractual obligations, which do not give rise to a duty in tort," Dkt # 20 at 21, and because WEI "alleges purely economic damages, which are not recoverable in tort." *Id.* at 23.

While "failure to perform a contractual obligation is not a tort in the absence of a duty to act apart from the promise made," *Anderson v. Fox Hill Vill. Homeowners Corp.*, 424 Mass. 365, 368 (1997), when a "duty arises out of the contract and is measured by its terms, negligence in the manner of performing that duty as distinguished from mere failure to perform it, causing damage, is a tort." *Id.*, quoting *Abrams v. Factory Mut. Liab. Ins. Co.*, 298 Mass. 141, 144 (1937). "When a party binds himself by contract to do a work or to perform a service, he agrees by implication to do a

workmanlike job and to use reasonable and appropriate care and skill in doing it." *Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co.*, 439 Mass. 387, 395-396 (2003), quoting *Abrams,* 298 Mass. at 143.

Here, WEI alleges here that defendants' negligence resulted in the loss of its European patent.   The First Circuit has recognized in patents a "property interest, even at the stage of a patent application." *In re Engage, Inc.*, 544 F.3d 50, 54 (1st Cir. 2008); *see also Ropes & Gray LLP v. Jalbert*, 454 Mass. 407, 410 (2009) ("Fundamentally, a patent is a property right."). Accordingly, WEI alleges loss of more than purely economic damages.  *C.f. Bay State-Spray & Provincetown S.S., Inc. v. Caterpillar Tractor Co.*, 404 Mass. 103, 107 (1989) (In Massachusetts, "when economic loss is the only damage claimed, recovery is not allowed . . . in negligence.").

Although inartfully pled, when read in the light most favorable to WEI, the FAC can reasonably be read to allege negligent performance of Source One's Agreement with WEI.  Accordingly, the court will allow Count 3 to go forward as against Source One.  Because the court has determined that Flex-Seal did not bind itself to the contractual obligations outlined in the Agreement, the court will dismiss Count 3 as against Flex-Seal.

### c. Count IV, violation of Chapter 93A, as to Flex-Seal and Source One

Finally, WEI alleges a violation of Chapter 93A of the Massachusetts General Laws.  "To be successful, a plaintiff bringing a claim under [Chapter 93A,] § 11 must establish (1) that the defendant engaged in an unfair method of competition or committed an unfair or deceptive act or practice, as defined by G.L. c. 93A, § 2, or the regulations promulgated thereunder; (2) a loss of money or property suffered as a result; and (3) a causal connection between the loss suffered and the defendant's unfair or deceptive method, act, or practice." *Auto Flat Car Crushers, Inc. v. Hanover Ins. Co.*, 469 Mass. 813, 820 (2014) (footnote omitted).  The jurisdictional threshold for a Chapter 93A claim is whether in their totality, the facts establish that "the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth." *Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*, 438 Mass. 459, 473 (2003).  Here, there is no material dispute about the various venues in which the acts alleged to comprise a Chapter 93A violation occurred.

Three factors are to be considered in assessing the center of gravity for purposes of an action under Chapter 93A: "(1) where defendant committed the deception; (2) where plaintiff was deceived and acted upon the deception; and (3) the situs of plaintiff's losses due to the deception." *Roche v. Royal Bank of Canada*, 109 F.3d 820, 829 (1st Cir. 1997), citing *Clinton*

*Hosp. Ass'n v. Corson Grp., Inc.*, 907 F.2d 1260, 1265-1266 (1st Cir. 1990). At the same time, "the center of gravity analysis is not solely based on a formula 'identified by any particular factor or factors' because a significant factor that exists in one case may not exist in another." *Arabian Support & Servs. Co., Ltd. v. Textron Sys. Corp.*, 368 F. Supp. 3d 211, 229 (D. Mass. 2019), quoting *Kuwaiti Danish Computer Co.*, 438 Mass. at 473. Whether a defendant's actions and transactions occurred primarily and substantially in Massachusetts for purposes of Chapter 93A jurisdiction is a matter of law. *Campagnie de Reassurance d'Ile de France v. New Eng. Reinsurance Corp.*, 57 F.3d 56, 90 (1st Cir. 1995).[10]  A defendant bears the burden of showing that the bulk of its alleged transgressions occurred primarily and substantially outside of Massachusetts. *Roche*, 109 F.3d at 829.

Defendants move to dismiss Count 4, arguing that WEI "has not alleged that conduct giving rise to its claim occurred primarily or substantially in Massachusetts." Dkt # 20 at 25. WEI responds that it has a viable Chapter 93A claim because "felt the loss of its intellectual property and other harms" in Massachusetts, where it is based, Dkt # 31 at 13; because "Fernco directed its subsidiaries to solicit and execute a licensing agreement

---

[10] In contrast, "[w]hether a certain act or omission (or cluster of acts or omissions) is actionable under chapter 93A is a question of fact." *Roche*, 109 F.3d at 827.

with WEI in Massachusetts, and to meet with and train at WEI's facilities in Massachusetts," *id.* at 15; and because WEI's Agreement with Source One contained a "Dispute Resolution clause specifying that the parties use a Massachusetts mediator." *Id.*; *see also id.* at 16 (asserting that harm to "WEI's brand, marketing position and goodwill" was "felt by WEI at its home").

"[W]hen 'virtually all the conduct that can be said to be unfair or deceptive' occurs outside the Commonwealth, there can be no Chapter 93A liability." *Kenda Corp. v. Pot O'Gold Money Leagues, Inc.*, 329 F.3d 216, 236 (1st Cir. 2003), quoting *Kuwaiti Danish Computer Co.*, 438 Mass. at 475. Here, the alleged misconduct relates to maintenance of WEI's European patent; a separate "patent application in Australia," FAC ¶ 88; business dealings with a "German manufacturer," *id.* ¶ 90, and "European and other foreign licensees," *id.* ¶ 91; and the defendants' foreign sales and manufacturing practices. In addition, as WEI makes clear in the FAC, it has felt the brunt of the effects of the alleged actions in Europe. WEI complains that the lapse of its European patent "has prevented WEI from selling [to] licensees *in Europe*" and that WEI can no longer claim to possess "protected technology in the European Union," *id.* ¶ 69 (emphasis added), such that "WEI's ability to market, license and sell its proprietary systems and

products *in the EU* has substantially diminished." *Id.* ¶ 70 (emphasis added). WEI also asserts that "[s]ales of Ultracoat *in Europe* have decreased significantly," *id.* ¶ 70 (emphasis added), and that WEI's "competitive advantage *in the EU*" has "significantly decreased." *Id.* ¶ 71 (emphasis added).

WEI argues that "a 'dominant event' giving rise to WEI's claims here is the Massachusetts-based WEI entering into the underlying contract with [d]efendants, a contract which [d]efendants subsequently breached." Dkt # 31 at 16. Whatever credit is given to this argument, in the context of the allegations made in the FAC, it is too slender a reed on which to anchor support for the proposition that the alleged "unfair or deceptive act or practice" that makes up the gravamen of WEI's Complaint "occurred primarily and substantially within the commonwealth." Mass. Gen. Laws ch. 93A, § 11; *see also First Sec. Bank, N.A. v. Nw. Airlines, Inc.*, 2001 WL 92175, at *5 (D. Mass. Jan. 3, 2001) ("The plaintiffs, it is true, felt the impact of the loss in Massachusetts, but . . . that fact is not determinative.").[11] Accordingly, the court will dismiss Count IV in its entirety.

---

[11] WEI does not separately contend that the defendants' meetings and training at WEI's Massachusetts facilities, nor the defendants' signing of contractual agreements, nor the Agreement's dispute resolution clause requiring use of a Massachusetts mediator, were themselves unfair and deceptive practices. *See Greg Beeche Logistics, LLC v. Skanska USA Bldg.,*

## ORDER

For the foregoing reasons, defendants' motion to dismiss for lack of personal jurisdiction over Fernco is <u>ALLOWED</u>, consequently Counts 4 and 5 are dismissed as to Fernco.  The defendants' motion to dismiss pursuant to Rule 12(b)(6) is <u>ALLOWED</u> on Counts 1, 2, and 3 with respect to Flex-Seal only, and on Count 4 as to both Flex-Seal and Source One.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE

---

*Inc.,* 2013 WL 5550673, at *3 (D. Mass. Sept. 23, 2013) (dismissing a Chapter 93A claim with prejudice, noting that "where there is no allegation that any unfair or deceptive acts occurred primarily and substantially within Massachusetts," a plaintiff "has failed to allege a plausible basis for this claim.").